UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

INNOVIDA HOLDINGS, LLC,
CLAUDIO OSORIO, AND CRAIG TOLL,

Defendants.
_____/

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

### I. INTRODUCTION

1. The Commission brings this action to enjoin InnoVida Holdings, LLC, Claudio Osorio, and Craig Toll from violating the anti-fraud provisions of the federal securities laws.

2. From no later than March 2007 until at least March 2010, InnoVida, a purported manufacturer of hurricane and fire-proof housing materials; and Osorio, the Company's President, raised approximately $16.8 million from at least five investors by offering and selling securities in the form of units and loan instruments in InnoVida.

3. Osorio was active in local and national politics as a fundraiser for political candidates. To add an air of legitimacy to InnoVida, Osorio recruited a high-profile board of directors for InnoVida that included a former governor of Florida. Osorio solicited investors through one-on-one conversations, sometimes during political fundraising events.

4. To lure investors, Toll, the Company's CFO, created financial statements showing InnoVida had more than $35 million in cash and more than $100 million in equity. Osorio told

1

at least one potential investor InnoVida was valued at $50 million, and another the Company was valued at $250 million. Osorio also told potential investors he was InnoVida's largest stakeholder and had invested tens of millions of his own money into the Company.

5. All of these statements were false. Toll's financial statements artificially inflated the Company's cash by nearly twentyfold. InnoVida was never valued at $50 million, let alone $250 million. And Osorio never invested tens of millions into the Company.

6. Osorio also enticed investors to increase their investments by guaranteeing a Middle Eastern sovereign wealth fund would purchase investors' shares for profits of approximately 900% by a date certain.

7. This claim was patently false. The Middle Eastern sovereign wealth fund investment was a ruse to solicit additional funds from investors.

8. Contrary to Osorio and InnoVida's representations to investors about how they would spend the money, Osorio misappropriated nearly half of investors' funds, or approximately $8.1 million, to support his lavish lifestyle.

9. Through their conduct, InnoVida, Osorio, and Toll violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

10. The Commission asks the Court to enter: (1) a permanent injunction restraining and enjoining the Defendants from violating the federal securities laws; (2) an order directing the Defendants to disgorge all ill-gotten gains, with prejudgment interest; (3) an order directing the Defendants to pay civil penalties; and (4) an order prohibiting Osorio and Toll from serving as officers and directors of a public company.

## II. DEFENDANTS

11. InnoVida is a Florida company formed in March 2006 with its principal place of business in Miami, Florida. InnoVida was known as COEG, LLC from March 2006 until Osorio changed the name to InnoVida in April 2008. From March 2007 until March 2011, InnoVida was purportedly in the business of manufacturing building panels used to construct hurricane and fire-resistant houses and other structures. On March 1, 2011, a Florida state court, in a proceeding concerning an investor's claim against InnoVida and Osorio, appointed a Receiver to take over InnoVida's operations. On March 24, 2011, the Receiver filed a Chapter 11 bankruptcy petition on behalf of the Company in the United States Bankruptcy Court for the Southern District of Florida. On December 16, 2011, the bankruptcy was converted to a Chapter 7 bankruptcy proceeding, which remains pending.

12. Osorio, 54, is a resident of Aventura, Florida. He was a managing member of InnoVida from March 2006 until March 2011, and InnoVida's president, CEO, and a member of the Company's board of directors from no later than March 2007 until March 2011. Osorio is a former Ernst & Young Entrepreneur of the Year Award winner.

13. Toll, 64, is a resident of Pembroke Pines, Florida. He is a certified public accountant licensed to practice in Florida since 1980. He was InnoVida's CFO from approximately December 2007 until March 2011.

## III. JURISDICTION AND VENUE

14. The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and v(a)]; and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

15. The Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida, because many of the Defendants' acts and transactions

constituting violations of the Securities Act and Exchange Act occurred in Miami, Florida. In addition, InnoVida's principal place of business was in Miami, and Osorio and Toll reside in the Southern District of Florida.

16. In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV. THE DEFENDANTS' FRAUDULENT OFFERING

### A. InnoVida's Purported Business

17. InnoVida was created in March 2006 and continued doing business until approximately March 2011, when the Company entered bankruptcy.

18. While the Company operated, its website described the Company as one that "manufactures building solutions that bridge the gap between energy efficiency, affordability and high quality. Using its proprietary technology, InnoVida manufactures Fiber Composite Panels which are used to build residential, commercial, government, military, globally relevant structures without the use of cement, steel, or wood and with significant savings in cost to build, time to build and energy cost to operate."

19. The Company further described itself on its website as "a global corporation with current operations in the USA, Germany, Middle East, Africa, India, China, Haiti, and South America."

20. To add an air of legitimacy to InnoVida, Osorio recruited a high-profile board of directors that included a former Florida governor, a lobbyist, and a successful real estate developer.

21. Osorio managed all aspects of InnoVida's business and had direct contact with investors whom he used to fund his business.

## B. The InnoVida Offering

22. From no later than March 2007 until at least March 2010, Osorio, directly and through InnoVida, raised money from investors to privately finance the Company's business.

23. Osorio solicited investors directly, through group presentations and one-on-one conversations.

24. For example, during a political fundraiser Osorio hosted at his home, Osorio touted InnoVida to a potential investor and invited him to visit InnoVida's factory in North Miami. Osorio later told this investor: the panels InnoVida manufactured passed Miami-Dade County hurricane code requirements; InnoVida had a contract with Miami-Dade County to build five homes; and InnoVida held patents on the process for manufacturing the panels. In September 2009, this investor, a lobbyist residing in Miami, invested $312,000 in InnoVida.

25. Osorio, directly and through InnoVida, offered and sold InnoVida securities in at least three forms.

26. First, at least two investors executed subscription agreements to purchase units of InnoVida shares. In September 2009, the aforementioned Miami-based lobbyist executed a subscription agreement and invested $312,000 for 1,250,000 shares of InnoVida stock at a price of 25 cents per share. This investor later contributed an additional $3.7 million in exchange for shares. On August 28, 2009, a professional basketball player invested $1 million in InnoVida in exchange for 5,128,205 Class A shares at a price of 19.5 cents per share.

27. Second, at least one investor executed a promissory note. Specifically, on February 12 and November 2, 2009, an investor loaned InnoVida a total of $3.75 million and

executed a three-year promissory note at an 8% annual interest rate. On October 30, 2009, the investor executed an "Amended and Restated Secured Note and Warrant Purchase Agreement," pursuant to which the investor agreed "the Securities to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account."

28.  Third, Osorio sold at least two investors a portion of his stake in InnoVida. For example, in five transactions from March 20 to May 14, 2007, Osorio sold 30% of InnoVida's common stock to an investor for $8 million. In September 2009, Osorio sold an investor approximately 1.9 million Class A shares in exchange for $100,000.

29.  All told, Osorio raised at least $16.8 million from at least five investors. Osorio commingled the investors' funds in various United States and foreign bank accounts he controlled.

### C. Misrepresentations And Omissions In The InnoVida Offering

30.  In connection with soliciting investments in InnoVida, Osorio and Toll, directly and through InnoVida, made material misrepresentations and omissions regarding InnoVida's financial condition. In addition, Osorio, directly and through InnoVida, made misrepresentations concerning: (1) InnoVida's share prices; (2) his personal investment in the Company; (3) a buyout agreement; and (4) the use of investor funds.

#### 1. Osorio And Toll Made False Statements About InnoVida's Financial Condition

31.  From no later than April 2009 until at least January 2010, Toll created baseless *pro forma* financial statements falsely portraying InnoVida as a cash-rich company.

32.  According to the financial statements, InnoVida's cash and cash equivalents ranged from $35 million to $39 million.

33.  For example, Toll drafted a *pro forma* financial statement for March 31, 2009 that stated InnoVida had more than $35 million in cash and cash equivalents, and equity of more than

6

$100 million. He also prepared a *pro forma* financial statement for December 31, 2009 that listed more than $39 million in cash and cash equivalents, and $122 million of equity.

34. These representations were false. The Company's bank accounts held less than $185,000 on March 31, 2009, and less than $2 million on December 31, 2009.

35. Toll failed to review all of InnoVida's bank account statements when he drafted the financial statements. Instead, he accepted Osorio's representations that the Company had these assets in the one account to which he did not have access.

36. Toll was reckless in relying on Osorio's representations. The accounts Toll did have access to did not show substantial assets, and Toll did not obtain or review the records for the account where Osorio claimed the assets were maintained.

37. Osorio and Toll used the false financial statements to lure investors.

38. Osorio had signatory authority over the Company's bank accounts and knew the information in the Company's financial statements was false.

39. Osorio used InnoVida's financial statements to convince investors the Company had substantial cash on hand and substantial shareholder equity. The financial statements Toll created were a central feature of Osorio's sales pitches, and Osorio frequently presented the statements to potential investors.

40. Toll also used the financial statements to solicit additional contributions from investors.

41. For example, during a September 2009 Board of Directors meeting, Toll discussed the March 31, 2009 financial statement with one investor and a potential investor in attendance. The investor subsequently increased his investment, and the potential investor made

his initial investment, based in part on Toll's representations about the Company's financial condition.

42.     Toll also discussed the financial statements during one-on-one conversations with investors. For example, in late January or early February 2010, Toll told an investor that while the December 31, 2009 financial statement stated it was "*pro forma*," the numbers, showing approximately $39 million in cash, were accurate. The investor then increased his investment in InnoVida.

43.     Toll had no basis for making this representation because there were no account statements reflecting these assets.

### 2. Bogus Share Prices

44.     From August to the end of September 2009, Osorio offered ownership interests to at least two investors based on false valuations.

45.     On September 9, 2009, InnoVida potential investors attended an InnoVida board meeting where Osorio falsely claimed the Company was valued at $250 million.

46.     Osorio had no basis for making this claim, which was patently false. Osorio's most recent valuation, in December 2008, was for $20 million – far less than the $250 million Osorio claimed.

47.     One week later, Osorio changed the valuation again. On September 16, 2009, Osorio offered an investor an ownership interest in InnoVida based on his claim the Company was worth $50 million. The investor purchased $100,000 of Osorio's stake in the Company for five cents per share.

48. When Osorio solicited this investor, he had no basis for claiming InnoVida was valued at $50 million. He knew at the time the Company had less than $40,000 in cash or cash equivalent assets.

49. Two weeks later, on September 30, 2009, Osorio changed the valuation yet again. This time, he told a potential investor he was selling shares to other investors for 25 cents per share. This was false. In truth, Osorio was selling shares to investors for significantly less than that, at 5 cents per share.

50. On September 30, 2009, the investor invested $312,000 at 25 cents per share.

### 3. Osorio's Claimed Investment

51. Osorio told at least one investor he had invested tens of millions of his own money into InnoVida.

52. The investor then invested $312,000 in September 2009.

53. However, Osorio never loaned or invested tens of millions into the Company. Instead, this was a ruse to induce investors to invest in InnoVida.

### 4. The Sovereign Wealth Buyout

54. Osorio concocted another elaborate ruse to induce one investor to add $3.7 million to his $312,000 InnoVida investment.

55. In early 2010, Osorio began mentioning to an investor he was in negotiations with a Middle East sovereign wealth fund to purchase a portion of InnoVida.

56. Osorio told the investor that, according to the terms of the supposed $500 million deal, a portion of that money would be used to buy units from existing shareholders at $2.50 per share.

57. In early 2010, the investor told Osorio he appreciated the opportunity, but that his liquidity was limited.

58. Over the next several weeks, Osorio continued to pressure the investor to act and claimed the deal was imminent.

59. Osorio went so far as to create a document showing the investor how much he would make once the sovereign wealth deal closed and was funded.

60. Based on Osorio's representations, the investor was able to raise approximately $700,000 in February 2010, and one month later borrowed $3 million from a close friend.

61. However, there was no sovereign wealth buyout deal. It was yet another scheme Osorio used to solicit additional funds from investors.

### 5. Osorio Misused Investors' Funds

62. Osorio raised approximately $16.8 million from five investors. The investors understood Osorio would use their money to grow InnoVida. For example, in October 2009, Osorio, on behalf of InnoVida, executed a Secured Note and Warrant Purchase Agreement with an investor and represented InnoVida would use the investors' proceeds for the "ongoing development plans of the Company."

63. Osorio never told investors he would use at least $8.1 million of the $16.8 million on himself.

64. Osorio used investors' money to pay the mortgage on his multi-million dollar mansion on Star Island in Miami Beach, Florida, the mortgage on his Colorado mountain retreat, the loan on his Maserati, country club dues, and to otherwise fund his lavish lifestyle.

## V. CLAIMS FOR RELIEF

### COUNT I

### Fraud In Violation of Section 10(b) and Rule 10b-5 of the Exchange Act
### Against All Defendants

65. The Commission repeats and realleges paragraphs 1 through 64 of this Complaint as if fully restated herein.

66. InnoVida and Osorio, from no later than March 2007 until at least March 2010, and Toll, from no later than April 2009 until at least March 2010, directly or indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

67. By reason of the foregoing, the Defendants, directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## COUNT II

### Fraud in the Offer or Sale of Securities in Violation of
### Section 17(a)(1) of the Securities Act
### Against All Defendants

68. The Commission repeats and realleges paragraphs 1 through 64 of this Complaint as if fully restated herein.

69. InnoVida and Osorio, from no later than March 2007 until at least March 2010, and Toll, from no later than April 2009 until at least March 2010, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

70. By reason of the foregoing, the Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

### Fraud in the Offer or Sale of Securities in Violation of
### Sections 17(a)(2) and (a)(3) of the Securities Act
### Against All Defendants

71. The Commission repeats and realleges paragraphs 1 through 64 of its Complaint as if fully restated herein.

72. InnoVida and Osorio, from no later than March 2007 until at least March 2010, and Toll, from no later than April 2009 until at least March 2010, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails: (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

73. By reason of the foregoing, the Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate Sections 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (a)(3)].

## VI. RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that the Defendants have committed the violations of the federal securities laws alleged in this Complaint.

### II.

### Permanent Injunctive Relief

Issue Permanent Injunctions, enjoining Defendants InnoVida, Osorio, Toll, their agents, servants, employees, attorneys, representatives, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating: (1) Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]; (2) Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (a)(3)]; and (3) Section 10(b) and Rule 10b-5 of the Exchange Act [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## III.

### Disgorgement

Issue an Order directing the Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## IV.

### Penalties

Issue an Order directing Defendants InnoVida, Osorio and Toll to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act, [15 U.S.C. § 78(d)].

## V.

### Officer And Director Bar

Issue an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] barring Defendants Osorio and Toll from serving as an officer or director of a public company.

## VI.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

December 7, 2012

Respectfully submitted,

By: _____
Amie Riggle Berlin, Esq.
Senior Trial Counsel
Florida Bar No. 630020
Direct Dial: (305) 982-6322
E-mail: berlina@sec.gov

*Attorney for Plaintiff*
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154